UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | MEMORANDUM AND ORDER |
| V. | ) | |
| | ) | |
| ALVIN PETERSON | ) | CASE NO. 2:08-mj-16 |

Alvin Peterson (Peterson) is charged with two Class B misdemeanor violations of 16 U.S.C. § 668dd(c) and (f)(2). Both charges allege improper drainage of wetlands subject to a United States Fish and Wildlife Service (FWS) easement. One charge concerns three separate wetlands in Section 15 and the other charge concerns one wetland in Section 16. The case was tried to the Court July 14 and 15, 2008. Counsel submitted written post-trial summations, the last of which was filed September 26, 2008. The Court has considered the evidence presented at trial, and the briefs of the parties, and issues the following decision.

To prove the charges, the United States must establish each of the following elements as to each charge by proof beyond a reasonable doubt: 1) that the United States holds a property interest, established through a properly recorded and accepted easement, 2) that identifiable wetlands existed at the time the easement was taken, 3) that Peterson knew that the wetlands at issue were subject to an easement, 4) that Peterson engaged in prohibited activity by disturbing, injuring, cutting, burning, removing, or destroying the wetlands at issue, 5) that the activity was not permitted or otherwise authorized, and 6) that Peterson's actions caused surface and/or subsurface damage which injured, disturbed, or destroyed the wetlands. <u>United States v. Johansen</u>, 93 F.3d at 467, (8th Cir. 1996). Peterson alleges that the government did not meet its burden of proof on any of the six elements of either charge. This Court finds that the government met its burden as to all elements of both charges.

**Section 15-156-59 (Violation Notice No. 0900741) - Easement Establishment, Identifiable Wetlands, and Peterson's Knowledge of Easement**

North Dakota lies within the prairie pothole region. The prairie pothole region has many small wetlands that provide excellent breeding and nesting grounds for waterfowl. The United

1

States has purchased easements from many North Dakota landowners; the easements prohibit landowners from draining wetlands or otherwise destroying the wetlands' suitability as waterfowl breeding and nesting grounds.  See generally, North Dakota v. United States, 460 U.S. 300 (1983).

Peterson inherited the W½, Section 15-156-59, from his father, Joe C. Peterson, subject to an FWS easement (Gov. Ex. 5).  On November 10, 1966, Peterson's father, together with his wife Emma Peterson, signed a conveyance of an easement to the United States for waterfowl management rights on Section 15, as well as on other farmland they owned.  (Gov. Ex. 1).  The United States accepted the easement on January 16, 1967, and paid $4,700 for the easement rights.  (Gov. Exs. 2 and 3).  There is no question the United States holds a properly recorded and accepted easement on Section 15.

The easement, designated Walsh County Easement 124X,1-3  (Gov. Ex. 1) provides:

> The parties of the first part [Joe C. Peterson and Emma Peterson], for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation.  It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working, and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.
>
> Excepted are certain drainage ditches which the parties

>of the first part may maintain and/or wetlands which are deleted from the provisions of this easement. The above exceptions are shown on a map certified by the Regional Director at the time of acceptance.[1]

No "map certified by the Regional Director at the time of acceptance" is in evidence. An Easement Summary, Gov. Ex. 4, lists total tract acreage of 1510.49 acres (in seven different sections of land), which includes 314.00 total wetland acres.

Peterson testified that he had farmed the W½ of Section 15 since 1955, having rented it from his father before he inherited it. Section 15 includes three of the four wetlands at issue in this case; they are designated as Wetlands 3, 5, and 8. From the outset, Peterson and FWS had disagreements about drainage in Section 15.

Peterson had constructed some drains on Section 15 before his father granted the easement, and there were disputes with FWS about what wetlands Peterson could drain without violating terms of the easement. In 1973, FWS employees met with Peterson, and a map of the Section 15 wetlands was drawn as a result of that meeting. (Gov. Ex. 13 and Def. Ex. 1). That document states, "This map is drawn to clarify those wetlands covered by the easement." Both parties refer to the document as a "renegotiation." A memo to the file, dated September 27, 1973, includes the following statement by an FWS employee about the map:

>Maps were prepared and signed by Alvin Peterson and myself that show what wetlands on the entire easement can not be drained. In essence just check to see he hasn't drained these. There are so many approved ditches that it's impossible to field check. Just check to see that the wetlands he can't drain as shown on the maps, aren't drained.

(Gov. Ex. 14). A former FWS employee who was involved in the 1973 meeting testified that "renegotiation" was done in part in response to court decisions calling the government's easement interests into question. As a result of the 1973 "renegotiation," FWS reduced its wetlands acreage on the 1966 easement by approximately 15 acres from the original 314.00 acres. (Id.).

The three Section 15 wetlands involved in this case are clearly illustrated on the 1973 map. Evidence about the 1973 map, however, was disputed. Former FWS employees testified that it was

---

[1] The second paragraph quoted above is not a part of the standard form in use at the time, but was added to the Section 15 easement.

prepared in Peterson's presence; Peterson testified that the copy of the map which was mailed to him after the meeting included wetlands that had not been drawn on the map while he was present. The copy of the map that was received as Government's Exhibit 13 has a paragraph crossed out, and also has the notation "N.A." regarding that paragraph.  The copy of the map which was received as Defendant's Exhibit 1 includes the same "N.A." notation, but does not have the paragraph crossed out.  Government Exhibit 13 includes a notation "Dike to be maintained" in reference to an area in the SW¼ of the property, but Peterson's Exhibit 1 does not include the notation about maintaining the dike.

The differences between the two exhibits are not directly relevant to the issues to be decided, since the paragraph that is crossed out on Gov. Ex. 13 is not at issue, and since the wetlands which are the subject of the charges are in the NW¼ rather than the SW¼ of section 15.  Peterson asserts, however, that the differences between the two copies are indicative that changes were made after Peterson signed the map, and argues that fact supports his testimony that the wetlands at issue were not all included in the map when he signed it.  This Court finds the testimony of former FWS employees was more credible that Peterson's testimony as to preparation of the 1973 map.

From 1980 until 2000, much of section 15 was not farmed, because it was enrolled in the federal waterbank program.  Peterson testified that he believed drains needed to be cleaned after the land came out of the waterbank program.  His disputes with FWS continued, ultimately resulting in a criminal charge filed against Peterson in 2004.  In that earlier case, C2-04-102 (D.N.D. February 8, 2005, Doc. No. 29), this Court found Peterson guilty of injuring certain wetlands, including the three Section 15 wetlands which are involved in this case.

This Court sentenced Peterson to a term of probation in the earlier case, and restoration of the injured wetlands was a condition of his probation.  Peterson did not comply with the restoration condition, and after three petitions and hearings addressing Peterson's failure to comply, this Court entered an Order Amending Conditions of Probation. (Gov. Ex. 16).  That Order authorized FWS to arrange for the wetlands restoration, and required Peterson to pay the costs of the restoration as restitution.

FWS hired a contractor to do the wetlands restoration, and that work was completed in Fall 2006.  (Gov. Exs. 17, 18, 19, 20, 21, and 22).  The three Section 15 wetlands involved in this case were restored by FWS's contractor in 2006.  Restoration included

placement of dirt "plugs" in the rims of each of the wetlands. There is no dispute that Peterson hired a contractor to remove dirt "plugs" that FWS's contractor had placed to restore the wetlands. In July 2007, Peterson's contractor, Scott Diseth, did the work Peterson had requested. The instant case charges that Peterson injured wetlands 3, 5, and 8 in Section 15 as a result of the contracted work.

Citing Johansen, 93 F.3d at 459, Peterson asserts that the government did not sufficiently delineate the wetlands covered by the Section 15 easement. He asserts that the language of the 1966 easement was vague, and that the easement summary does not cure the defect, because it identifies only aggregated wetlands acreage. Peterson asserts that there was no map attached to the 1966 easement, that there was insufficient proof that Wetlands 3, 5, and 8 existed in 1966, that the 1973 "renegotiated" map is of no significance because Peterson did not own the land at the time he signed the map, and that Wetlands 3, 5, and 8 were drawn on the 1973 map after Peterson signed it.

Peterson argues that the easement summary is not a sufficient identification of wetlands under the standards of North Dakota, 460 U.S. at 311. In North Dakota, a footnote states, "As the easement agreements make clear, however, the restrictions apply only to wetlands areas and not to the entire parcels." Id. at 311, note 14. North Dakota was interpreted in Johansen, in which the Eighth Circuit stated:

> It is important to note, however, that although the Supreme Court generally accepted the federal government's argument limiting the easement restrictions to the encumbered parcels' wetlands, it did not explicitly limit the wetland easement to the Summary Acreage. The Court merely stated that '[t]he fact that the easement agreements include descriptions of much larger parcels does not change the acreage of the wetlands over which the easements have been acquired.' 93 F.3d at 465 (citing North Dakota).

The easement summary identifies total wetlands acreage in all seven of the subject sections of land on an aggregated basis, rather than on a parcel-by-parcel basis. In other words, the summary does not identify the wetland acreage specific to the W½ of Section 15. Peterson has identified no caselaw supporting his assertion that an easement summary must identify wetlands acreage on a section-by-section basis, and this Court has found no authority supporting that position. While North Dakota and Johansen prohibit FWS from claiming an easement on more than the 314.0 total acres described in the wetlands summary, this Court does not interpret those cases

as requiring parcel-by-parcel wetlands acreage.

Government Exhibit 48 is an aerial photograph of Sections 15 and 16, taken in 1962. Mike Estey, an FWS wildlife biologist specialist, testified that the wetlands depicted in Section 15 in the 1962 aerial photo were of the same approximate size, shape, and location as the wetlands drawn on the 1973 map. (Doc. No. 26, Estey testimony, at 10). Peterson alleges that Estey was not qualified in "wetlands forecasting," and that neither the 1962 photo nor the 1973 map is sufficient to establish that Wetlands 3, 5, and 8 existed in 1966. Peterson, in effect, asserts that the government must prove that there was water standing in each of the wetlands as of the date of the easement. That position is inconsistent with the language of the easement itself, with the nature of the wetlands at issue, and with governing caselaw.

The easement prohibits "draining . . . of any surface water including . . . potholes, <u>now existing or reoccurring due to natural causes</u> on the [subject] tract." (Gov. Ex. 1). The easement's language contemplates a natural fluctuation in actual surface water within the protected wetlands, and recognizes that wetlands may naturally reoccur. There is no doubt that Wetlands 3, 5, and 8 existed when the aerial photograph was taken in 1962.[2] (Gov. Ex. 48). There is no doubt that all three wetlands were included in the 1973 map. (Gov. Ex. 13 and Def. Ex. 1). It is possible that, on November 10, 1966, when Peterson's parents signed the easement conveyance, not each of the three wetlands held surface water. It is also possible that not each of the three wetlands held surface water on January 16, 1967, the date the United States accepted the easement. In fact, given the time of year that both those events occurred, there may have been no surface water in any of the three wetlands on either date. That does not, however, mean that the three areas were not wetlands in existence when the easement was created.

The government is not required to establish a precise legal description of each protected wetland. <u>United States v. Vesterso</u>, 828 F.2d 1234, 1242 (8th Cir. 1987). "The presence of the recorded easement agreements describing wetlands in clear terms and the existence of identifiable wetlands on the parcel are sufficient proof that the United States has a property interest in the wetlands on the parcel." <u>Id.</u> The government established, by proof beyond reasonable doubt, that Wetlands 3, 5, and 8 were in existence at the time the easement was granted. There was no evidence, as there was in <u>Vesterso</u>, of wetlands expansion. Beyond

---

[2] The government asserts that Exhibit 48 is, among available aerial photographs, the one taken closest in time to the easement purchase.

a reasonable doubt, the United States met the <u>Johansen</u> and <u>Vesterso</u> requirement of proving identifiable, covered wetlands in Section 15.

Peterson did not own Section 15 at the time he signed the 1973 map, and there was no evidence he had legal authority to sign in his father's stead. His signature on the 1973 map was not, however, necessary to establish the government's easement, since Peterson's father had granted the easement in 1966. The 1973 map is relevant primarily to establish Peterson's knowledge that Wetlands 3, 5, and 8 were subject to an easement. The government established, beyond a reasonable doubt, that Peterson knew Wetlands 3, 5, and 8 were subject to an easement.

An additional basis for determining that the wetlands in Section 15 were sufficiently identified and that Peterson had knowledge of the easements rests in the doctrine of collateral estoppel. This Court's decision in Case No. C2-04-102 included a finding that Wetlands 3, 5, and 8 had been sufficiently identified, and that Peterson had knowledge of the protected status of each of those wetlands. That decision was affirmed both by the District Judge (Doc. No. 73, C2-04-102), and by the United States Court of Appeals for the Eighth Circuit. (Doc. No. 106, C2-04-102) (No. 05-4248, 8th Cir., May 5, 2006). Although the government has not raised the doctrine of collateral estoppel, its application is supported by caselaw in this circuit. <u>United States v. Hernandez-Uribe</u>, 515 F.2d 20 (8th Cir. 1975). In <u>Hernandez-Uribe</u>, the appellate court affirmed a district court's decision to apply collateral estoppel in instructing the jury that the defendant charged with illegal re-entry had earlier been found to be an alien. The earlier case had been one in which the defendant had entered a guilty plea to a charge, the essential elements of which included him being an alien.

There are differences among the federal circuit courts in application of the doctrine of collateral estoppel against a defendant in a criminal case. In <u>United States v. Gallardo-Mendez</u>, 150 F.3d 1240 (10th Cir. 1998), the Court reversed a conviction in which the trial court had invoked collateral estoppel to establish that the defendant was an alien. As in <u>Hernandez-Uribe</u>, the earlier case had involved a guilty plea to a charge which included as an essential element the defendant being an alien. The <u>Gallardo-Mendez</u> court limited its holding to situations involving a prior guilty plea: "We now hold that the government may not use a judgment following a plea of guilty to collaterally estop a criminal defendant from relitigating an issue in a subsequent criminal proceeding." <u>Id.</u> at 1246.

United States v. Pelullo, 14 F.3d 881 (3rd Cir. 1994) rejected application of collateral estoppel to establish an element of a Rackeeer Influenced and Corrupt Organization Act offense by use of a defendant's earlier jury conviction for wire fraud.  The Pelullo court based its decision on the right to a jury trial guaranteed by the Sixth and Seventh Amendments to the United States Constitution.  The instant case, however, is not one in which there is a right to trial by jury.  This Court has identified no caselaw addressing application of collateral estoppel when both the prior case and the case in which the doctrine is applied are cases decided by a court, rather than by a jury.  This Court concludes that, pursuant to Hernandez-Uribe, collateral estoppel is an additional basis upon which to find that Wetlands 3, 5, and 8 were sufficiently identified, and that Peterson had knowledge of their protected status.

**Section 16-156-59 (Violation Notice No. 0900742) - Easement Establishment, Identifiable Wetlands, and Peterson's Knowledge of Easement)**

In October 2003, Peterson purchased a parcel of land which adjoins the West ½ of Section 15, namely the N½SE¼ of Section 16-156-59.  (Gov. Ex. 10).  At the time he purchased the parcel in Section 16, it was subject to an easement for waterfowl management rights, which a previous owner had granted to the United States in 1968.  (Gov. Exs. 7, 8, 9, and 11).  The Section 16 easement includes the language quoted in the first paragraph on page 2 above, but not the language quoted in the second paragraph.  There is no doubt the United States holds a properly recorded and accepted easement on Section 16.

The government established, by proof beyond reasonable doubt, that Wetland 2 was sufficiently identified.  An April 28, 2004 letter from FWS to Peterson explicitly advised him that Wetland 2 was protected.  (Gov. Ex. 11).  Beyond a reasonable doubt, Peterson had knowledge that Wetland 2 was protected.

**Sections 15 and 16 - Prohibited Activity**

Peterson asserts that the contractor he hired worked only outside the outer boundaries of Wetlands 3, 5, and 8.  He relies on photos taken by FWS employees for that position. (Gov. Exs. 27, 28, and 29).  The testimony of Peterson's contractor established, however, beyond a reasonable doubt, that the boundaries of Wetlands 3, 5, and 8 were breached at Peterson's direction.

The United States established, beyond reasonable doubt, that Peterson's contractor excavated into Wetland 2 on Section 16.  In

fact, Peterson's brief states, "It is undisputed that excavator Scott Diseth appears to have cleaned the waterway all the way through the wetland." (Doc. No. 119 at 21). Peterson asserts that Diseth did more excavation on Section 16 than Peterson had requested. Diseth testified that he followed starting and stopping points Peterson had showed him, that Peterson left the area while Diseth was working but later came back, and that Peterson indicated his satisfaction with the work after Diseth completed it. This Court finds the testimony of Diseth more credible than the testimony of Peterson. Beyond a reasonable doubt, Peterson hired Diseth to perform work on Section 16 that was prohibited by the easement.

Peterson argues that FWS improperly prohibited any ditching work within 200 feet downstream from the wetlands. However, the evidence established that Peterson engaged in prohibited activity which breached boundaries of each of the wetlands. This Court therefore need not address whether FWS acted outside its authority with respect to a "200 foot rule." Nor is it necessary to address Peterson's assertion that there is a question where Wetland 2 starts and stops, since he admits the waterway was cleaned all the way through the Section 16 wetland.

**Sections 15 and 16 - Lack of Authority**

Having established a properly recorded easement interest, identifiable wetlands, Peterson's knowledge of the wetlands easement, and Peterson's prohibited activity, the United States must next establish that the activity was not permitted or authorized. Peterson asserts his actions were permitted to clean out natural watercourses or pre-existing drainage channels. Peterson argues he acted within his rights under North Dakota law, and relies in part on a 1997 letter from the state engineer. (Def. Ex. 2). That letter does not support Peterson's position; it makes only a general statement about a landowner's rights and obligations to maintain water channels, and specifically refers to a need to work with FWS to ensure that work on the land did not violate the easement. A 2006 letter from the state engineer is contrary to Peterson's interpretation of the state's position: "It is the opinion of this office that the Court-ordered action to close the drains does not constitute blocking of a natural waterway as you have asserted." (Gov. Ex. 49). There is no credible evidence that the United States granted permission for the excavation Peterson arranged. As to Section 16, in fact, that permission was specifically denied. (Gov. Ex. 12). Beyond a reasonable doubt, Peterson's actions were not permitted or authorized by law.

**Sections 15 and 16 - Wetlands Damage**

The government presented testimony of Robert Gleason, a research wildlife biologist with expertise in prairie wetlands. Gleason testified that the potential water depths of each of the four wetlands at issue had been reduced by 87% to 100% because of Peterson's contractor's work, although some still have capacity to hold "small pockets" of water.

Peterson alleges that the government did not present evidence comparing the wetlands to their condition in 1966, when the easement was established. The government met its burden to identify the wetlands, and was not required to prove the precise water levels as they existed in 1966.

The government proved, beyond any reasonable doubt, that Mr. Peterson's actions damaged each of the four wetlands. The exterior boundary of each was broken, and the ditching extended into the wetlands themselves. Wetlands damage as set forth in <u>Johansen</u> was sufficiently established.

                                **ORDER**

The government having established, by proof beyond a reasonable doubt, each of the six essential elements as to each of the charges, this Court finds Alvin Peterson guilty of the two crimes charged in the Violation Notices. The USPPSO is directed to complete a pre-sentence investigation, with sentencing to be scheduled after completion of that investigation.

Dated this 11th day of November, 2008.


                                        */s/ Alice R. Senechal*
                                        Alice R. Senechal
                                        U.S. Magistrate Judge